IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


KENDALL P. TULLER                                                                                    PLAINTIFF


v.                                          NO. 1:16-cv-00024 PSH


CAROLYN W. COLVIN, Acting Commissioner                              DEFENDANT
of the Social Security Administration


## MEMORANDUM OPINION AND ORDER

Plaintiff Kendall P. Tuller ("Tuller") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Tuller maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Tuller first maintains that his mental impairments meet or equal Listing 12.02, and the ALJ erred at step three of the sequential evaluation process when he failed to so find. Tuller additionally maintains that his residual functional capacity was erroneously assessed because the medical opinions relevant to his mental impairments were improperly discounted.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

At step three, the ALJ is required to determine whether a claimant's impairment meets or equals a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical one, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that his impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 12.02 encompasses organic mental disorders, disorders defined as "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." A claimant meets or equals the required level of severity for the listing when he satisfies paragraphs A and B or paragraph C of the listing. Paragraph B requires the showing of an organic mental disorder resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of an extended duration. Paragraph C requires the showing of an organic mental disorder that causes more than a minimal limitation of the ability to do basic work activites and one of the following: "repeated episodes of decompensation, each of [an] extended duration;" "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or a "[c]urrent history of [one] or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangment."

The ALJ is also required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).

A summary of the evidence relevant to Tuller's mental impairments reflects that on November 3, 2011, he was seen by Dr. Nancy Bunting, Ph.D., ("Bunting") for an intellectual assessment and evaluation of adaptive functioning. See Transcript at 345-349. She recorded his history and noted, in part, the following:

> [Tuller] has lived at his present address, a house, for 11 years. He lives with [his] 37-year-old wife, who is working, her 6 children ranging in age from 4 to 17, and their 2-year-old child. This is [Tuller's] first marriage, and they have been married for 3 years. He has no other children.
>
> [Tuller] reported that he completed 10th grade, and he did not get a GED. He denied he was held back a grade, but he was placed in resource classes for math and reading beginning in the 2nd grade and continuing through the 10th grade. He has had no other training or schooling. He has not been in the military.
>
> …
>
> [Tuller] last worked doing lawn care 5 days/week 25 hours/week for 2 months. He got along with his supervisor and co-workers. He left that job in June 2011 because his boss saw him gasping for breath and this scared him. Previously, he had worked at a fast food restaurant doing food preparation 4 hours/day, 4 days/week for 1 ½ months. He got along with his co-workers and his boss. He left that job in the summer of 2009 because the manager stated that he "did not know what he was doing" because he could not remember the order for preparing sandwiches.

See Transcript at 346. Bunting observed that Tuller's thoughts were logical, relevant, and goal-directed, but he had difficulty following directions. His persistence was good, his pace was within normal limits, and his concentration was adequate. She administered Wechsler Adult Intelligence Scale ("WAIS") testing, and his full scale IQ score was seventy-seven or within the borderline range of intellectual functioning. She noted, though, that there were "significant differences" among his various IQ scores. She diagnosed an attention deficit hyperactivity disorder, "adult residual," see Transcript at 347, and opined the following with respect to his adaptive functioning:

> [Tuller] can do all self-care. …
>
> [Tuller's] wife drove him to the appointment today. He drives by himself on familiar roads only for 100 miles. He can shop by himself and has no problems doing that. He does not presently use a check book, and he previously had problems with one. He has no problems counting change. His wife pays his bills on time, and he would probably need help to do this as he has always had difficulties organizing things. He does regular household chores like washing dishes, doing laundry, sweeping and cleaning, but not vacuuming or cooking. He spends his time doing childcare and housekeeping, listening to the radio and music, reading magazines and science fiction, and using Playstation for 5-6 hours at a time. He enjoys playing guitar and swimming.
>
> [Tuller] said his relationship with his wife was "very good," and he gets along with all the children "okay." He is in contact with his parents who are still married. He has friends and attends the Kingdom Hall 2 x week. He has contact with his neighbors.
>
> [Tuller] was able to communicate and interact in a socially adequate manner.
>
> [Tuller] was able to communicate in an intelligible and effective manner.

> [Tuller] has some capacity to cope with the typical mental/cognitive demands of basic work-like tasks as he is functioning in the borderline range of mental intelligence. However, his digit span was in the deficient range and he has great difficulty following instructions, e.g., serial 3s, probably because of this deficit. He could not do serial 3s due to his lack of understanding of the instructions, but he could count backwards from 20 with no problems. His Immediate Recall was poor. He reports that he gets along with co-workers and supervisors. Based on his behavior in the interview, he has some ability to deal with the public. He can handle some work stress and change if he can deal with 7 children. He has great difficulty following instructions due to difficulty with comprehension that is probably a function of his limited working memory.
>
> [Tuller] has a limited ability to attend and sustain concentration on basic tasks. His digit span fell in the deficient range, and he could count backward from 20 with no problems. He reports playing the guitar and reading for pleasure, and these activities require sustained attention.
>
> [Tuller] was able to sustain his persistence during the testing session and interview which focused on himself. His frustration tolerance appeared to be good.
>
> [Tuller] has some ability to complete work-like tasks within an acceptable time frame.

See Transcript at 348-349.

On August 20, 2013, Tuller was seen by Dr. Ken Coon, Ed.D., ("Coon") for a mental diagnostic evaluation. See Transcript at 418-425. Coon recorded Tuller's history and noted, in part, the following:

> [Tuller] alleges confused and dysfunctional thinking. He has difficulty following directions. He reported that as a child he was left in a car and was poisoned by the carbon monoxide. His entire school experience was spent in Special Ed classes. He reports that he was tested in school and that his IQ is 90.

> …
>
> Mood-He reported that his mood most days is frustration. He lacks patience with his children. He and his wife have 7 children age 4-21.
>
> Memory-[Tuller's] long-term memory and his short term memory are poor.
>
> …
>
> [Tuller] has had dysfunctional thinking since childhood. … He has had several jobs that he lost because he could not follow simple instructions. For example, he could not remember how to put together a sandwich at McDonald's.

<u>See</u> Transcript at 418-419. Tuller reported that he was living with his wife and their seven children. Although she performs most of the household chores, he assists with the laundry. He can drive familiar routes and is capable of attending to his personal care. Coon observed that Tuller's affect and speech were normal, although his thought process was scattered and confused at times. Coon performed no testing and made no diagnosis but opined that Tuller appeared to be functioning within or near the mentally retarded range. With respect to Tuller's adaptive functioning, Coon opined the following:

> How do the mental impairments interfere with this person's day to day adaptive functioning? [Tuller] can manage all [activities of daily living]. There is no interference [with] day to day functioning.
>
> Capacity to communicate and interact in a socially adequate manner? Good. [Tuller] communicates with family and friends.
>
> Capacity to communicate in an intelligible and effective manner? Adequate. He communicated adequately with me during the interview. He did ramble and talk too much at times. I had to direct him back to the question several times.

> Capacity to cope with the typical mental/cognitive demands of basic school or work-like tasks. He could not do so. His thinking is dysfunctional and confused.
>
> Ability to attend and sustain concentration on basic tasks. Poor. He presented confusion and lack of focus.
>
> Capacity to sustain persistence in completing tasks. Poor. He could not do so.
>
> Capacity to complete school or work-like tasks within an acceptable timeframe. Not able to do so.

See Transcript at 423-424. Coon then added the following assessment of Tuller's effort during the evaluation:

> [Tuller] was confused and expansive in his presentation. There were times when I doubted his sincerity and credibility. He seemed to be striving to give me every piece of evidence possible to show that he was disabled. For example, when I asked him about Depression, he equated it with worrying only, while his sleep patterns had not been unusual and he does not cry.
>
> I feel the results of this inquiry are compromised 10%. [Tuller] needs to be tested to improve the ability to assess his allegations.

See Transcript at 424.

From May of 2014 through July of 2014, Tuller sought therapy at the Methodist Family Health Clinic for his depressed mood and family problems. See Transcript at 442-478. The progress notes from his therapy were prepared primarily by Regina Conway, LAC, ("Conway") and Robin Hickerson, LAC, ("Hickerson"), and their notes reflect a diagnosis of mild mental retardation and include the following assessment:

> … [Tuller] is functioning at about a young teen age and has similar interests. He somatizes and feels he cannot function due to various physical problems that do not actually impair him. Even when specialists tell him he is ok, prefers to believe the worst and enjoys talking about it. Wife encourages him. She works full time and could use some help around the house but most of [Tuller's] time is in activities he enjoys while in bed with his leg elevated. Has not been able to keep a job due to being slow cognitively and getting physical problems due to them.

<u>See</u> Transcript at 452. Tuller's affect and thought content were typically appropriate, and his thought process was typically appropriate and goal directed. By the time of his last visit, Conway opined that Tuller's family problems are greatly improved.

On August 25, 2014, Samantha Jackson, R.N., ("Jackson"), a mental health professional at Arkansas Counseling Associates, signed a letter in which she represented the following:

> It is my assessment with Kendal P. Tuller that he suffers from Depressive Disorder, Generalized Anxiety Disorder (includes overanxious DO of childhood), and Borderline Intellectual Functioning.
>
> Symptoms include: Depressed moods expressed 4-5 times weekly, Sleep disturbance 4-5 times weekly, fatigue and low energy daily, difficulty concentrating and making decisions daily, hopelessness, Social isolation/withdrawal daily, poor relationships with peers, loss of motivation, victim of trauma from past with being severely bullied in school and physically abused, feeling isolated or alienated from other people, difficulties experiencing normal feelings of pleasure or happiness, feeling anxious/nervous, worries incessantly about things, feels like he cannot stop worrying, feeling anxious/embarrassed in social situations, fear of disapproval or rejection in social situations, feeling shy or uncomfortable around others, avoiding or leaving social situations because they make him uncomfortable, has a hard time following through with directions or tasks, easily distracted, forgetful, difficulty organizing, and often loses things.
> I have worked with this family going on two years and although I have seen

many improvements it is my opinion that due to the severe anxiousness and social isolation that it will be very difficulty for [Tuller] to have and keep a job.

See Transcript at 527-528.

Tuller began seeing Jackson and, at times, Samantha Costner, MHP, ("Costner") and Dr. Christopher Winslow, M.D., ("Wislow") at Arkansas Counseling Associates. See Transcript at 530-561. The progress notes from Tuller's visits reflect that his mood was typically appropriate; his thought process was typically clear, coherent, and organized; and he was generally oriented to time, place, person, and situation. He was usually assigned a Global Assessment of Functioning ("GAF") score at or below fifty, and his difficulties were believed to substantially interfere with, or otherwise limit, his "functioning in instrumental living skills (e.g. maintaining a household, managing money, getting around the community, taking prescription medication)." See Transcript at 541. It is worth noting, though, that with respect to Tuller's intellectual functioning, Winslow once observed the following: "Given good vocabulary and apparently normal ability to abstract based upon todays interview, I doubt the ... concerns raised about low IQ have any basis but testing will rule this out." See Transcript at 556.

Tuller's medical records were reviewed by state agency medical professionals. See Transcript at 82-94, 96-109, 111-124, 126-140. The medical professionals agreed that Tuller is capable of performing unskilled work, i.e., work that involves simple, repetitive tasks with incidental interpersonal contact and direct, concrete supervision.

Tuller's wife completed a series of documents in connection with Tuller's claims for disability insurance benefits and supplemental security income payments. See Transcript at 257-258, 259-266. In the documents, she represented, inter alia, that he has difficulty understanding, remembering, following instructions, concentrating, completing tasks, and sometimes getting along with others. A typical day for him consists of attending to his personal care, doing some light work around the house, napping, and taking baths in an attempt to relieve his back and knee pain. His hobbies include listening to music and playing on a computer. He occasionally attends church but "mostly stays [at] home." See Transcript at 263.

The record contains a summary of Tuller's FICA earnings. See Transcript at 219. The summary reflects that although he worked consistently from 1987 through 2011, his earnings were minimal.

Tuller testified during the administrative hearing. See Transcript at 44-64. He testified that he was born on April 6, 1964, and was therefore forty-seven at the time of the hearing. He completed the tenth grade in school before he dropped out, and he could not recall why he dropped out. He has a driver's license and drives short distances. He lives with his wife and seven children. Tuller can attend to his personal care and can help with household chores. He spends his days playing his guitar and playing games on his computer. He attends religious meetings twice a week. He has difficulty understanding and following directions and was once fired from a job at a Sonic because he could not remember the directions for assembling a hamburger.

The ALJ found at step two that Tuller's severe impairments include attention deficit hyperactivity disorder, a major depressive disorder, borderline intellectual functioning, and a general anxiety disorder. The ALJ found at step three that Tuller does not have an impairment, or combination of impairments, that meets or equals a listed impairment, specifically finding that his mental impairments do not meet or equal Listing 12.02. The ALJ then assessed Tuller's residual functional capacity and found that he can perform light work, although he has the following limitations caused by his mental impairments:

> … [Tuller] can have no more than occasional changes to the workplace setting. He is limited to work where interpersonal contact is incidental to the work performed; the complexity of one-to-two step tasks can be learned and be performed by rote with few variables and little judgment; the supervision required is simple, direct, and concrete; SVP 1 or 2 jobs that can be learned within 30 days; and work that is simple, routine, and repetitive task type work. …

See Transcript at 19. In making the assessment, the ALJ assigned great weight to Bunting and Coon's opinions and some weight to the opinions of the state agency medical professionals. The opinions of Conway, Hickerson, Jackson, and Costner were considered by the ALJ, but the opinions were not given "the same weight as medical documentation from acceptable medical sources." See Transcript at 28. The ALJ found at step four that Tuller cannot return to his past relevant work but found at step five that there is other work he can perform. The ALJ concluded that Tuller is not disabled for purposes of the Social Security Act.

The record reflects, and the ALJ properly found, that Tuller has mental impairments. The ALJ could weigh the various medical opinions as he did, specifically crediting Bunting and Coon's opinions and discounting Conway, Hickerson, Jackson, and Costner's opinions. The ALJ found that Tuller's mental impairments do not meet or equal paragraphs B or C of Listing 12.02, and the ALJ could so find as substantial evidence on the record as a whole supports his finding for the reasons set forth below.

Tuller's mental impairments does not satisfy the requirements of paragraph B of Listing 12.02 for four reasons. First, the ALJ could and did find that Tuller has only mild limitations in his activites of daily living. Bunting noted that Tuller can drive by himself on familiar roads, attend to his personal care, count change, perform light housework, and has hobbies that include playing a guitar, reading magazines, using a computer, and using Playstation five to six hours a day. Although Coon doubted Tuller's sincerity and credibility, Coon opined that Tuller can manage all of his activities of daily living, and his limitations do not interfere with his day-to-day functioning. Tuller testified that his daily activities are quite limited, but there is no medical evidence that the limitation is caused by his mental impairments.

Second, the ALJ could and did find that Tuller has only moderate difficulties in maintaining social functioning. Bunting noted that Tuller has a very good relationship with his wife and gets along with their seven children. He is in contact with his parents, has friends, attends religious meetings twice a week, and has contact with his neighbors. Coon simply noted that Tuller communicates with his family and friends.

Third, the ALJ could and did find that Tuller has only moderate difficulties in maintaining concentration, persistence, or pace. Bunting opined that although Tuller has difficulty following instructions, Tuller has some ability to cope with the typical mental/cognitive demands of basic work-like tasks, has some ability to deal with the public, and can handle some work stress and change. Although Bunting noted that Tuller has a limited ability to attend and sustain concentration, Bunting observed that Tuller can play a guitar and read for pleasure, activities that require sustained attention. Bunting also observed that Tuller was able to sustain his persistence during the evaluation. Although Coon believed Tuller's ability to maintain concentration, persistence, or pace was poor, the ALJ could give greater weight to Bunting's opinions on that issue because Coon doubted Tuller's sincerity and credibility.

Fourth, there is no medical evidence that Tuller's mental impairments have caused him to experience episodes of decompensation, which have been of an extended duration. Specifically, there is no medical evidence the symptoms associated with his mental impairments have caused periods of decline in, or a downturn of, his condition.

There is also no medical evidence that Tuller's mental impairments satisfy the requirements of paragraph C of Listing 12.02. Assuming, _arguendo_, that his mental impairments cause more than a _minimal_ limitation of his ability to do basic work activities, there is no medical evidence of repeated episodes of decompensation, no medical evidence of a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual to decompensate," and no medical evidence of a history of an inability to function outside a highly supportive living arrangement. The medical evidence instead indicates that the consequence of Tuller's mental impairments caused no periods of decline in, or a downturn of, his condition. He can handle some work stress and change, and he has no history of an inability to function outside of a high supportive living arrangement.

Tuller also maintains that his residual functional capacity was erroneously assessed. It is his contention that in making the assessment, the ALJ improperly discounted the medical opinions relevant to Tuller's mental impairments.

The ALJ must consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). The ALJ may reject any opinion if it is inconsistent with the record as a whole. See Bentley v. Shalala, 52 F.3d 784 (8th Cir. 1995). The manner in which the ALJ evaluates the opinions will be disturbed only if it falls outside the available zone of choice. See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006).

The question for the ALJ was the extent to which the limitations caused by Tuller's mental impairment affect his ability to perform work-related activities. The ALJ incorporated a limitation for Tuller's mental impairments into the assessment of his residual functional capacity and found that he can perform unskilled work. Substantial evidence on the record as a whole supports the ALJ's assessment, and the manner in which he evaluated the medical opinions was within the available zone of choice. The Court so finds for two reasons.

First, the ALJ adequately considered the medical evidence relevant to Tuller's mental impairments and, in doing so, could properly credit Bunting and Coon's opinions. The ALJ's assessment is consistent with Bunting's observation that Tuller has some ability to cope with the typical mental/cognitive demands of basic work-like tasks, has some ability to deal with the public, can handle some work stress and change, and can sustain some measure of attention as he plays a guitar and reads for pleasure. To the extent Coon's opinions are reliable, given his observation that he questioned Tuller's sincerity and credibility, the ALJ's assessment is largely consistent with Coon's opinion. Coon opined that Tuller can manage all of his activities of daily living, his limitations do not interfere with his day-to-day functioning, and he communicates with his family and friends. It is true that Coon had concerns about Tuller's ability to maintain concentration, persistence, or pace, but the ALJ accounted for those concerns in crafting Tuller's residual functional capacity. The ALJ's assessment is also consistent with the opinions offered by the state agency medical professionals, all of whom opined that Tuller is capable of performing unskilled work.

Tuller faults the ALJ for discounting the opinions of Conway, Hickerson, Jackson, and Costner, but the ALJ could properly do so. Conway, Hickerson, Jackson, and Costner are not "acceptable medical sources." See 20 C.F.R. 404.1513(a), 20 C.F.R. 416.913(a). Instead, they are "other sources." See 20 C.F.R. 404.1513(d)(1), 20 C.F.R. 416.913(d)(1). Moreover, their opinions appear to be based largely on Tuller's self reports, and their opinions are, to some extent, inconsistent with the record as a whole.

With specific regard to the opinions offered by Jackson in her August 25, 2014, letter, the ALJ could and did properly discount the opinions. The Court adopts the following reasons given by the ALJ for doing so:

> The [ALJ] notes that on August 25, 2014, ... Jackson ... stated she has treated [Tuller] for two years. ... However, records from ... Jackson ... indicate [Tuller] was admitted for treatment at Arkansas Counseling Associates on August 26, 2014. The only prior mental health treatment ... Jackson listed on intake was by Methodist Family Health. ... The [ALJ] does not find the opinion of ... Jackson ... persuasive. There are no medical treatment records to support ... [Jackson's] opinion on August 25, 2014. The evidence of record indicates that the treatment history by ... Jackson ... is quite brief.

See Transcript at 28.

Second, the ALJ adequately considered the non-medical evidence relevant to Tuller's mental impairments. The ALJ considered, inter alia, Tuller's daily activities, activities that include playing the guitar, reading magazines, and spending several hours a day on a computer. The ALJ also considered Tuller's social functioning and various precipitating and aggravating factors. For example, the ALJ could and did credit Bunting's observation that Tuller can handle some work stress and change if he can deal with seven children and noted that he has friends, attends religious meetings twice a week, and has contact with his neighbors.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Tuller's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 18th day of January, 2017.

                                          UNITED STATES MAGISTRATE JUDGE